IN THE DISTRICT COURT FOR THE SOUTHERN DISTRICT
OF WEST VIRGINIA AT HUNTINGTON

TAMMY JOHNSON,             Civil Case No.  3:19-cv-00856
                                  Judge Chambers

       **Plaintiff,**

v.

JAMES B. NUTTER & CO.

and

REVERSE MORTGAGE FUNDING LLC

and

TERRA ABSTRACT TRUSTEE WEST VIRGINIA, INC.

       **Defendants.**

## PLAINTIFF'S MEMORANDUM OPPOSING DEFENDANT JAMES B. NUTTER COMPANY'S MOTION TO DISMISS

## I.  INTRODUCTION

Plaintiff Tammy Johnson is a disabled woman and the surviving widow of Archie Johnson. Plaintiff and Archie Johnson lived together 22 years before formally marrying on May 27, 2007 in Sevier County, Tennessee. That year, plaintiff and Archie Johnson also jointly purchased a double-wide manufactured home which was delivered to land titled to Mr. Johnson only. Plaintiff has resided in this home ever since.

Without plaintiff's knowledge, in 2008 Archie Johnson fraudulently procured a reverse mortgage purporting to be secured by his land and the jointly-owned manufactured home, by claiming to be unmarried. Archie Johnson died in 2014. Defendants claim a right now to foreclose upon the land and the manufactured home pursuant to a reverse mortgage Deed of Trust, due to default arising solely because of Archie Johnson's death.

HUD oversees and regulates the federal laws governing reverse or Home Equity Conversion Mortgages (HECM). In a reverse mortgage, no monthly payments of principal or interest are required. No payment of principal or interest is due until the borrower dies, abandons the home, or sells it. The death of the last reverse mortgage borrower generally does allow a reverse mortgage lender to stop extending credit, call the reverse mortgage loan immediately due, and collect payment through foreclosure.

HUD encourages lenders to offer reverse mortgages by insuring HECM loans. That insurance protects lenders against loss if a deceased borrower's home does not bring at foreclosure a price sufficient to pay the entire mortgage balance, including accumulated interest and charges, as then due. A HECM lender obtains payment by assigning the HECM loan to HUD at one of the stages HUD policies allow for assignment. Assignment of this HECM loan to HUD is precisely what defendant Reverse Mortgage Funding LLC will do if Tammy Johnson's home were sold at foreclosure, since it is unlikely her home will bring a foreclosure sale price sufficient to pay off a reverse mortgage loan accumulating interest and charges for over 11 years.

In HECM parlance, a "non-borrowing" spouse is one who was married to a reverse mortgage borrower but is not a signatory to the HECM loan or the Deeds of Trust which secure it. The Deed of Trust-related right to remain in the home without making monthly loan payments until one's death generally applies only to HECM *borrowers*. Thus, as to HECM loans originated before 2014, *non*-borrowing spouses may face foreclosure upon the borrower's death, even if they continue to reside in the marital home.

In 2015, HUD established a "non-borrowing spouse" program to address this nationwide problem, which had developed because of a conflict between HUD's original HECM regulations

and the governing statute, 12 U.S.C. § 1715z-20(j).[1] To remedy the problems this conflict

caused, HUD created the MOE (Mortgagee Optional Election) program to benefit both reverse

mortgage lenders and the millions of "non-borrowing" spouses of deceased HECM borrowers

caught in the dilemma HUD's original HECM regulations created in certain pre-2014 HECM

loans.

Under the MOE policy, HUD will take assignment of any pre-2014 HECM loan at a

stage *before* foreclosure if the loan involves a qualifying non-borrowing spouse who survived the

borrower and continues to reside in the home. Upon the lender's request that HUD take

assignment at this pre-foreclosure stage, the maturity and due date of the reverse mortgage loan

is extended and deferred until the non-borrowing spouse also dies. In compensation, HUD pays

the lender the full balance due under the loan at the time of assignment, including accumulated

interest, fees, and charges.[2] The MOE program offers lenders like Nutter and/or RMF the same

guarantee against financial loss defendants would claim if the foreclosure sale of Tammy

Johnson's home failed to fully pay the balance due under Archie Johnson's loan, but does so

without requiring that non-borrowing spouse Tammy Johnson be made homeless.

Tammy Johnson is a "non-borrowing spouse," and the reverse mortgage now held by

defendants James B. Nutter & Co. (Nutter) and/or Reverse Mortgage Funding LLC (RMF) is

eligible for assignment to HUD **now** under the MOE program. The extension and deferral of the

maturity of the mortgage debt that MOE assignment grants will allow Tammy Johnson to remain

in her home for the rest of her life, and will fully pay the defendants what they are owed at the

[1] *Cf., e.g.*, *Bennett v. Donovan*, 4 F.Supp.3d 5 (D.D.C. Sept. 30, 2013).

[2] *See* HUD Mortgagee Letters 2015 -15 and 2019-15, attached as Exhibit 1.

time of assignment, without requiring that plaintiff's home now be sold.

Tammy Johnson gave Nutter written proof of her "non-borrowing spouse" status on March 23, 2018, along with her application requesting Nutter assign Archie Johnson's HECM loan to HUD, so that the maturity and due date of the mortgage debt would be extended and deferred until her own death. The loan was never assigned, although Nutter thereafter dealt with Tammy Johnson as having the duties of a non-borrowing spouse occupying the home under the MOE program, in ways that benefitted Nutter and RMF but prejudiced Tammy Johnson.

Because Nutter never assigned the mortgage loan to HUD pursuant to Tammy Johnson's 2018 application, plaintiff had to file this action originally in the Wayne County Circuit Court to stay a scheduled October 29, 2019 trustee sale of her home. On December 23, 2019, plaintiff filed a second, renewed application to Nutter and RMF requesting assignment of this HECM loan to HUD under the new, six month window for such assignments created by HUD Mortgagee Letter 2019-15.  Plaintiff asserts defendants Nutter and/or RMS owe a good faith obligation of fair dealing that requires them to cooperate with plaintiff's renewed request that this loan by assigned to HUD **now** under the MOE program.  Doing so will get the defendants' fully paid, and allow plaintiff to live in her home until her death.

## II.    STATEMENT OF FACTS AND STATEMENT OF THE CASE

Plaintiff Tammy Johnson was in her twenties when she moved in with the much older Archie Johnson. After being together for twenty-two years, plaintiff and Archie Johnson formally married in Sevier County, Tennessee on May 27, 2007. Plaintiff remained married to Archie Johnson until his death on March 13, 2014.

Archie Johnson had a secretive and guarded personality. Throughout the relationship, Mr. Johnson kept the financial circumstances and details of the household, his income and expenditures, and his financial dealings secret from Tammy Johnson. (Complaint, ¶ 1 - ¶4).

In May 2007, plaintiff and Archie Johnson jointly purchased a new double-wide Clayton manufactured home from Keene Family Owned Homes, Inc.[3]  The home was delivered to land Archie Johnson had acquired in his name alone from his daughter. After road delivery of the two sections making up the home, the setup crew bolted the sections together, supporting them on concrete block pillars, and installed trailer skirting. The home lacks the permanent foundation affixed to real estate which West Virginia law requires to change the legal nature of a manufactured home from personal property to a fixture of realty. At all times since purchase, it has remained possible to separate the two halves of the double-wide home, reinstall road wheels and tow bars, and move the sections making up the home to a different location, in the same fashion the home sections were originally delivered. (Complaint, ¶ 5 - ¶10).

After the purchase, plaintiff and Archie Johnson resided together in the manufactured home at all times through Archie Johnson's death. In July 2008, without plaintiff's knowledge, consent, or involvement, Archie Johnson obtained a reverse mortgage loan from defendant James B. Nutter & Co. That loan named him as sole borrower. That loan was secured by Deeds of Trust on the real estate upon which sits the manufactured home which was half-owned by Tammy Johnson. To obtain the reverse mortgage loan, Archie Johnson fraudulently represented himself to be an unmarried man. Further, on information and belief, Archie Johnson did not disclose the personal property nature of the manufactured home, or Tammy Johnson's undivided one-half ownership interest in that home. Tammy Johnson did not sign the promissory note or the Deed of Trust for the reverse mortgage, or otherwise grant a consensual lien upon her ownership interest in the personal property of the manufactured home. (Complaint, ¶ 11 - ¶16).

---

[3] *See* purchase contract attached to complaint.

Tammy Johnson did not learn of the nature of the 2008 loan until after Archie Johnson's death. Had she been notified of the loan application in 2008, or asked to consent to it or any security interest in her home, Tammy Johnson would not have consented because she would lose her home when the older Archie Johnson died. (Complaint, ¶ 18 - ¶19).

Archie Johnson was married to Tammy Johnson at the time of the fraudulent 2008 reverse mortgage loan. Tammy Johnson remained married to him until his death. Both resided in the home through the time of Archie Johnson's death. Tammy Johnson still lives in the home. Tammy Johnson was Archie Johnson's heir and now owns all rights and interest in the manufactured home and the land it on which it sits.  Defendants however seek to enforce Archie Johnson's HECM debt against plaintiff's property by foreclosure because Archie Johnson's death constituted a default under the pre-2014 reverse mortgage loan and Deed of Trust. These facts mean plaintiff and the reverse mortgage loan at issue satisfy all criteria for a non-borrowing spouse assignment of the loan to HUD under the MOE program established by HUD Mortgage Letters 2015-15 and 2019-15.

Accordingly, Tammy Johnson applied to defendant Nutter on March 23, 2018 to extend Archie Johnson's reverse mortgage credit transaction and defer the maturity and due date of that reverse mortgage loan until her own death or abandonment of the home, by assigning the loan to HUD so as to obtain payment under the MOE program. Plaintiff's application facially showed her satisfaction of the HUD criteria. However, Nutter never assigned this loan to HUD. (Complaint, ¶ 19 - ¶ 26).

Nonetheless, defendant Nutter thereafter treated plaintiff as owing it the duties of a non-borrowing spouse occupying the home under the MOE program. After Archie Johnson's death and her inheritance of full, undivided ownership of Archie Johnson's land and the manufactured home in which she resides, Tammy Johnson obtained in her own name and on her own account a

State Farm hazard insurance policy covering her manufactured home against perils and injury. Tammy Johnson is the sole policyholder for that coverage. (Complaint, ¶ 27 - ¶ 28).

In July, 2018, plaintiff's manufactured home was damaged by a severe storm. State Farm determined the manufactured home had suffered approximately $10,500.00 in storm damage. It approved payment of $9,293.62 in insurance benefits under Tammy Johnson's policy so that she could repair her home. But defendant Nutter demanded State Farm issue the insurance proceeds paid under plaintiff's policy by check payable jointly in its name.

Generally, Nutter would have no lawful right to so demand, since plaintiff never granted defendants a lien or other security interest in her manufactured home, or in the proceeds of her hazard policy. (Complaint, ¶ 29 - ¶ 33). However, Nutter's demand *was* consistent with obligations Nutter *could* require of Tammy Johnson if she were occupying the home as an approved non-borrowing spouse with a right to remain in the home until her death under the MOE program. Nutter therefore must have accepted Tammy Johnson's status and right to remain in the home until her death, pursuant to the undertakings made in her MOE application, since otherwise Nutter had no claim or right to the proceeds of plaintiff's insurance policy.

Nutter then refused to endorse the joint insurance check, which prevented plaintiff from cashing it to start repairs. Nutter demanded instead that plaintiff endorse the check and deliver it to Nutter. Again, Nutter had no right and plaintiff no duty do so *unless* plaintiff were a non-borrowing spouse occupying the home under the MOE program, which would subject her to the duties of a borrower to obtain deferral of the maturity of the loan until her own death. (Complaint, ¶ 34 - ¶37). Plaintiff acceded to Nutter's demands and claim of right, endorsing her insurance proceeds check and surrendering it to Nutter. Defendants Nutter and/or RMS have at all times since continued to withhold most of those insurance proceeds from plaintiff.

By this conduct, in order to obtain Tammy Johnson's insurance proceeds, Nutter represented and acted toward Tammy Johnson as recognizing and accepting her non-borrowing spouse status. Only accepting her MOE status and the rights accompanying it would have created any duty for plaintiff to keep the home insured for Nutter's protection. Tammy Johnson relied on and responded to Nutter's claim of right, to her prejudice, by endorsing her insurance check and delivering it to Nutter. The complaint therefore alleges that defendants are now equitably estopped from denying plaintiff's MOE status or her right to remain in the home until her death, although defendants' pursuit of foreclosure purports to do just that.  (Complaint, ¶ 34 - ¶ 40).

Despite that estoppel, the collection agent, defendant Terra Abstract Trustee West Virginia, Inc. (Terra), undertook plans to sell plaintiff's home under a HECM Deed of Trust signed by Archie Johnson. Plaintiff's complaint alleges Terra claimed the right to conduct a sale on October 29, 2019 under a Deed of Trust which plaintiff never signed. Further, the complaint alleges the Deed of Trust was obtained solely because of Archie Johnson's fraud and concealment of the transaction from plaintiff, and/or by means of Nutter's failure to exercise due diligence in the underwriting and processing of that loan.[4] Moreover, the complaint alleges, defendants are estopped from asserting a right to conduct that sale before plaintiff's death or abandonment of the home; doing so contradicts and is inconsistent with the status Nutter claimed plaintiff had to obtain her insurance proceeds, a claim that was valid and proper only if plaintiff was MOE approved and entitled to reside in the home until her death.

---

[4] If Nutter was not actually in collusion with Archie Johnson to defraud Tammy Johnson, had it exercised due diligence, it would have uncovered Archie Johnson's true marital status, and the fact that he was not the sole owner of the personal property in which he and Tammy Johnson resided, during a proper underwriting process. Discovery is necessary to flesh out the actual facts surrounding the underwriting process and what Nutter did, or did not, actually know.

Additionally, the complaint alleged an intention wrongfully to sell Tammy Johnson's manufactured home, though it is personal property not affixed to the realty, and despite the fact that plaintiff never granted defendant Nutter or defendant RMF any security interest or mortgage lien upon her ownership interest in that personal property. Plaintiff lacked an adequate remedy at law to stop the sale and save her home other than by filing an affirmative quiet title action in the Wayne County, West Virginia Circuit Court. (Complaint, ¶ 64 - ¶69).

The complaint named Nutter, RMS, and Terra as defendants. It alleged five counts of relief. Counts Two, Three, and Four are damage claims alleged against defendant Nutter; the damage Counts Two and Three are also alleged against RMS.  Count One asserts the facts which estop Nutter and RMF, and their collection agent Terra, from seeking to foreclose on plaintiff's home. This Count asks for a declaratory judgment that these defendants are equitably estopped from seeking to foreclose on plaintiff's home until her death. The theory is that factually Nutter and RMF benefitted from claiming plaintiff owed duties that would apply to her only if she were a non-borrowing spouse with a right to occupy the home until her death under a lender- approved MOE application. Since plaintiff detrimentally relied on defendants' assertion that she owed such duties, defendants may not now equitably deny the concomitant rights to which such duties would be married.

Count Five was also asserted against all three named defendants. That Count pleads an equitable action to quiet plaintiff's title against any claim of right to foreclose on plaintiff's home under a fraudulently-obtained, and/or negligently-closed reverse mortgage to which plaintiff was not a party, and under which plaintiff granted defendants no rights or security interests in her manufactured home. That Count also asks for equitable reformation of obligations purportedly secured by plaintiff's home to protect her as the innocent victim of a fraud by one who owed her the duties of a fiduciary.

9

Upon receipt of the complaint, defendant Terra moved to dismiss it, asserting plaintiff stated no valid claims against it. Defendant Nutter thereafter removed the litigation to this Court, mooting the scheduled hearing. Terra then refiled its motion in this Court. Since then, both defendant Nutter and defendant RMF have moved to dismiss complaint counts One and Five, relating to foreclosure of Ms. Johnson's home. Defendant Nutter has also moved to dismiss plaintiff's claim under the Equal Credit Opportunity Act and its implementing Regulation B, alleged as Count Four, which is the federal claim on which Nutter based its claim of removal jurisdiction.

Before this action was removed, plaintiff notified all defendants' counsel that on September 23, 2019, HUD issued a new MOE Mortgagee Letter applying to all HECM loans. By that issuance, HUD re-started defendants' opportunity to obtain full payment of this loan by assigning it to HUD under new, relaxed non-borrowing spouse criteria.[5] That opportunity remains available **only until March 22, 2020**. Plaintiff with that notice requested defendants' assistance and cooperation in arranging an immediate assignment, to the benefit of all parties to this litigation. On December 23, 2019, plaintiff served a new application for approval of her assignment request, in accord with the standards set out in HUD Mortgagee Letter 2019-15.

## III.    STANDARD OF REVIEW

Motions to dismiss for failure to state a claim are viewed with disfavor and should be granted rarely. *See Rogers v. Jefferson-Pilot Life Ins. Co*., 883 F.2d 324, 325 (4th Cir.1989) (reaffirmed in *Mylan Laboratories, Inc. v. Matkari*, 7 F.3d 1130, 1134 n. 4 (4th Cir.1993); *Edmonds v. Altice Technical Services US LLC*, --- F.Supp.3d ----, 2019 WL 4383396, 1

---

[5] *See* HUD Mortgagee Letter 2019-15, Exhibit 1.

(S.D.W.Va. 2019); *Perry v. Tri-State Chrysler Jeep, LLC*, 2008 WL 1780938, *3 (S.D.W.Va. 2008). A complaint need contain only "a short and plain statement of the claim showing . . . entitle[ment] to relief." Fed. R. Civ. P. 8(a)(2); *Erickson v. Pardus*, 551 U.S. 89, 93 (2007). The "short and plain statement" must only provide "'fair notice of what the ... claim is and the grounds upon which it rests.' " *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 545 (2007); *see also Anderson v. Sara Lee Corp.*, 508 F.3d 181, 188 (4th Cir. 2007).

"[A] formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555; *Giarratano v. Johnson*, 521 F.3d 298, 304 (4th Cir. 2008). At least one plausible fact must be alleged as to each element of a claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Monroe v. City of Charlottesville*, 579 F.3d 380, 386 (4th Cir. 2009).

But the decisions in *Twombly* and *Iqbal* did not change the generally liberal standard of notice pleading. Those decisions suggest that a court may disregard legal conclusions that amount only to mechanical recitations of legal elements; district judges are not thereby empowered to disregard or weigh the credibility of actual allegations of fact. *F.D.I.C. v. Baldini*, 983 F.Supp.2d 772, 785 (S.D.W. Va. 2013). A complaint need not "make a case" against a defendant or even "forecast evidence sufficient to prove" a claim. *Chao v. Rivendell Woods, Inc.*, 415 F.3d 342, 349 (4th Cir. 2005); *Raab v. Smith & Nephew, Inc.*, 150 F. Supp 3d 671, 682 (S.D. W.Va. 2015). A complaint "does not require 'detailed factual allegations.' " *Iqbal*, 556 U.S. at 678. The complaint "need only give the defendant fair notice of what the claim is and the grounds upon which it rests." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.,* 637 F.3d 435, 440 (4th Cir. 2011); *F.D.I.C. v. Baldini, supra*.

A Rule 12(b)(6) motion tests the sufficiency of a complaint; it does not, however, resolve disputes about the facts, the merits of a claim, or the applicability or merit of affirmative defenses. *King v. Rubenstein*, 825 F. 3d 206, 214 (4th Cir. 2016), citing *Edwards v. City of*

*Goldsboro*, 178 F. 3d 231, 243 (4th Cir. 1999). District courts should not resolve affirmative defenses on a motion to dismiss unless all facts necessary to the defense "clearly appear[ ] on the face of the complaint." *Goodman v. Praxair, Inc.,* 494 F.3d 458, 464 (4th Cir. 2007) (*en banc*) (quoting *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993)); "[I]t is rarely appropriate to analyze affirmative defenses via a Rule 12(b)(6) motion unless 'the face of the complaint clearly reveals the existence of a meritorious affirmative defense.'" *Guy F. Atkinson Const., a Div. of Guy F. Atkinson Co. v. Ohio Mun. Elec. Generation Agency Joint Venture 5*, 943 F.Supp. 626, 639 (S.D.W.Va. 1996).

The district court is required to "'accept as true all of the factual allegations contained in the complaint....'" *Erickson*, 551 U.S. at 94; *see also S. C. Dept. of Health and Envtl. Control v. Commerce and Indus. Ins. Co*., 372 F.3d 245, 255 (4th Cir. 2004). The Court must also draw in the plaintiff's favor all reasonable inferences that may be made from the facts alleged. *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999).

If the legal validity of a claim depends upon the truth of an alleged fact, the plaintiff is entitled to present evidence as to that fact, meaning a motion to dismiss may not be granted at the pleading stage. A court may not dismiss a complaint because it doubts the factual allegations or considers recovery unlikely. *Neitzke v. Williams*, 490 U.S. 319, 327 (1989) ("Rule 12(b)(6) does not countenance . . . . dismissals based on a judge's disbelief of a complaint's factual allegations"); *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974) (a well-pleaded complaint may proceed even if it appears "that a recovery is very remote and unlikely") Skepticism or uncertainty do not render allegations implausible. *See Iqbal*, 556 U.S. at 681, 129 S.Ct. 1937 (explaining allegations cannot be called "conclusory" merely because a judge views them as "extravagantly fanciful," "unrealistic," or "nonsensical"). Nor does the fact that claims may not fall precisely within the four corners of prior case law alone give grounds for dismissal –

On the contrary, Rule 12(b)(6) dismissals 'are especially disfavored in cases where the complaint sets forth a novel legal theory that can best be assessed after factual development.'

*Wright v. North Carolina*, 787 F.3d 256, 263 (4th Cir. 2015) quoting *McGary v. City of Portland*, 386 F.3d 1259, 1270 (9th Cir.2004). In such cases, a plaintiff should be given an opportunity to develop evidence before the merits are resolved. *Davison v. Randall*, 912 F.3d 666, 691 (4th Cir. 2019).

## IV.   ARGUMENT

Defendant James B. Nutter Co. (Nutter) has moved to dismiss only Counts One, Four, and Five of the complaint. Nutter does not dispute the complaint states facts sufficient to allege valid claims for relief against it as to complaint Counts Two and Three. Consequently, litigation against Nutter without question will proceed to discovery.

### A.   As to complaint Counts One and Five, Nutter's arguments on the statute of limitations and *res judicata* fail for the reasons explained fully in plaintiff's December 11, 2019 memorandum opposing defendant Terra Abstract's motion to dismiss, Dkt. # 5, pageID # 151 – 155.

Nutter's memorandum adopts, incorporates, and summarizes claims to the affirmative defenses of *res judiciata* and the statute of limitations as advanced by the other defendants. Plaintiff similarly adopts and incorporates here the points raised in opposition to those other motions, which show that neither argument gives a legitimate ground for dismissal of her complaint.[6]

As to *res judiciata*, in this removed action, West Virginia law controls as to how and when *res judicata* bars a second action. *Erie v. Tompkins*, 304 U.S. 64 (1936); *Brooks v. Arthur*,

---

[6] *See* December 11, 2019 memorandum opposing defendant Terra's motion to dismiss, Dkt. # 5, and January 6, 2020 memorandum opposing defendant Reverse Mortgage funding's motion to dismiss, Dkt. # 14.

626 F.3d 194, 200 (4th Cir. 2010). Broadly phrased, in West Virginia law the rule of *res judicata* is that "'a judgment on the merits in a prior suit bars a second suit involving the same parties or their privies based on the same cause of action.' " *Porter v. McPherson*, 198 W.Va. 158, 166, 479 S.E.2d 668, 676 (1996); *see also Conley v. Spillers,* 171 W.Va. 584, 588, 301 S.E.2d 216, 220 (1983) (noting that "the central inquiry on a plea of res judicata is whether the cause of action in the second suit is the same as in the first suit"); *Hannah v. Beasley*, 132 W.Va. 814, 821–22, 53 S.E.2d 729, 733 (1949) (" 'A cause of action between persons who were parties to a former adjudication, set up in a subsequent action between them, is not *res judicata* by the former decision, unless it is identical with the one actually or constructively heard and determined in the former suit.' " (quoting Syl. pt. 1, *Lutz v. Williams,* 84 W.Va. 216, 99 S.E. 440 (1919))).

Other states, and the federal common law, apply a "transactional" standard for determining claim preclusion. Not so West Virginia. This state expressly has adopted and maintains a "same evidence" test to determine whether *res judicata* prohibits a second suit between the same parties on a cause of action that is not identical to that litigated in the first case.

> The test to determine if the ... cause of action involved in the two suits is identical is to inquire whether the same evidence would support both actions or issues.... If the two cases require substantially different evidence to sustain them, the second cannot be said to be the same cause of action and barred by *res judicata*.

*White v. SWCC*, 164 W.Va. 284, 290, 262 S.E.2d 752, 756 (1980) (citations omitted). *See also Slider v. State Farm Mut. Auto. Ins. Co.*, 210 W.Va. 476, 481, 557 S.E.2d 883, 888 (2001):

> Erie and State Farm argue in this case that "where the same facts and transactions giving rise to the first suit serve as the basis for the second suit, the second suit is barred by the doctrine of res judicata, even though the second suit attempts to assert different legal theories of recovery." (Emphasis added). We note, however, that this Court has not adopted a transaction-focused test for determining whether successive proceedings involve the same claim or cause of action. . . . . Rather, in *White v. SWCC*, 164 W.Va. 284, 290,

262 S.E.2d 752, 756 (1980), we embraced the "same-evidence" approach for determining whether two claims should be deemed to be the same for purposes of claim preclusion: a party a right to judicial relief. 50 *C.J.S. Judgments* s 648; *See, McNunis v. Zukosky*, 141 W.Va. 145, 89 S.E.2d 354 (1955). The test to determine if the issue or cause of action involved in the two suits is identical is to inquire whether the same evidence would support both actions or issues. *Gallaher v. City of Moundsville*, 34 W.Va. 730, 12 S.E. 859 (1891); *See McNunis v. Zukosky*, 141 W.Va. 145, 89 S.E.2d 354 (1955)**. If the two cases require substantially different evidence to sustain them, the second cannot be said to be the same cause of action and barred by res judicata.**

(citation omitted; emphasis added).

It is obvious that a 2017 default judgment entered in *James B. Nutter & Co. v. Tammy Johnson, Adminstratrix of the Estate of Archie Johnson*, Wayne County Circuit Court Case No. 16-P-041, does not bar plaintiff's personal claims under the West Virginia law of *res judicata*.

First, the parties are not identical. Tammy Johnson brings this action in her personal capacity as a natural person. The Estate of Archie Johnson was the only defendant party in the earlier action. Ms. Johnson was not personally a party in that case and was not personally sued in that case. Her name appears in it only in relation to a representative capacity, as Archie Johnson's probate administrator. The Estate of Archie Johnson is not a plaintiff party in this action. There is no identity of parties between the two actions as the *res judicata* bar requires.

Second, the only claim actually asserted by Nutter in the earlier action was a claim to correct the legal description in the Deeds of Trust for the 2008 reverse mortgage. That description was erroneous, in that it left out the "excepting and reserving" clause of Archie Johnson's granting deed.  The causes of action in the two suits facially are **not** identical. Proof of the claims asserted in plaintiff's complaint would not be supported by presenting the same evidence Nutter had to present to prove a scrivener's error in a legal description. For this reason as well, the West Virginia rule on *res judiciata* does not preclude plaintiff's equitable claims.

As to the affirmative defense of the statute of limitations, the Fourth Circuit rule is that district courts should not adjudicate affirmative defenses on a motion to dismiss unless all facts

15

necessary to the defense "clearly appear[ ] on the face of the complaint." *Goodman v. Praxair, Inc.,* 494 F.3d 458, 464 (4th Cir. 2007) (*en banc*) (quoting *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993)); "[I]t is rarely appropriate to analyze affirmative defenses via a Rule 12(b)(6) motion unless 'the face of the complaint clearly reveals the existence of a meritorious affirmative defense.'" *Guy F. Atkinson Const., a Div. of Guy F. Atkinson Co. v. Ohio Mun. Elec. Generation Agency Joint Venture 5*, 943 F.Supp. 626, 639 (S.D.W.Va. 1996).

Again, it is the West Virginia law on statutes of limitation that govern in this removed action. The West Virginia Supreme Court has set forth the proof elements necessary for the affirmative defense of the statute of limitations:

> A five-step analysis should be applied to determine whether a cause of action is time-barred. First, the court should identify the applicable statute of limitation for each cause of action. Second, the court (or, if questions of material fact exist, the jury) should identify when the requisite elements of the cause of action occurred. Third, the discovery rule should be applied to determine when the statute of limitation began to run by determining when the plaintiff knew, or by the exercise of reasonable diligence should have known, of the elements of a possible cause of action . . . Fourth, if the plaintiff is not entitled to the benefit of the discovery rule, then determine whether the defendant fraudulently concealed facts that prevented the plaintiff from discovering or pursuing the cause of action. Whenever a plaintiff is able to show that the defendant fraudulently concealed facts which prevented the plaintiff from discovering or pursuing the potential cause of action, the statute of limitation is tolled. And fifth, the court or jury should determine if the statute of limitation period was arrested by some other tolling doctrine.

Syllabus Pt. 5, *Dunn v. Rockwell*, 225 W.Va. 43, 689 S.E.2d 255 (2009); *see also W.W. McDonald Land Co. v. EQT Prod. Co*., 983 F. Supp. 2d 790, 809 (S.D.W. Va. 2013). Only the first element is a question of law; "the resolution of steps two through five will generally involve questions of material fact that will need to be resolved by the trier of fact." *Dunn v. Rockwell*, 225 W.Va. at 53; 689 S.E.2d.at 265.

The material facts required to address and satisfy steps two through five of the *Dunn v. Rockwell* test appear nowhere in plaintiff's complaint. Consequently, consideration of any statute of limitations defense at this preliminary stage is inappropriate.

Second, this case seeks equitable and declaratory relief only as to the issues concerning the fraudulent 2008 reverse mortgage loan. Nutter's arguments assume the application of the same statutes of limitations that would apply to suits for damages, but that assumption is incorrect. West Virginia has established **no** statutes of limitation barring equitable claims concerning real property. *See Dunn v. Rockwell,* 225 W.Va. at 54; 689 S.E.2d.at 266; *Boster v. Live Well, et al*., 2018 WL 1582725, *5 (S.D.W.Va. 2018) ); *EQT Gathering Equity, LLC v. Fountain Place, LLC*, 2012 WL 13018972, *3 (S.D.W.Va. 2012) (quoting *Dunn v. Rockwell* "Our law is clear that there is no statute of limitation for claims seeking equitable relief."). Because West Virginia recognizes no statute of limitations bar to the only relief actually requested against the defendants in Counts One and Five, a defense of statute of limitations is wholly inapplicable and Nutter's motion on these grounds without merit.

**B.     The complaint alleges a cause of action for Nutter's violations of 15 USC § 1691d. On March 23, 2018, plaintiff applied to Nutter for "credit" within the special definition established by the Equal Credit Opportunity Act, and the complaint alleges Nutter did not give written notice of action as the law requires. Further, Nutter failed to give written notice of adverse action in the format and time required under Regulation B if the application was being denied. There is no exemption to the first requirement and no exemption applies to the second since plaintiff was not in default on any loan. A delinquency or default on a loan only in her deceased husband's name cannot abrogate her separate, individual right to proper and timely notice on her own application, without constituting invidious discrimination because of her marital status.**

The Equal Credit Opportunity Act, 15 U.S.C. §1691 *et seq*. has no real common law antecedent. Congress first created the statute and the private cause of action by which it may be enforced in 1974, where it is codified in Title 41 of Chapter 15 U.S.C. as part of the federal

17

Consumer Credit Protection Act. Sister laws in that Act include the Truth in Lending Act, the Fair Credit Reporting Act, and the Fair Debt Collection Practices Act.

The various causes of action for which these components of Title 41 provide are all creatures of statute, crafted by Congress out of whole cloth, outside the common law of torts. For this reason, the federal courts have consistently held that questions about the application of and causes of action created by these statutes are pure questions of statutory construction; the United States Supreme Court and the United States Courts of Appeal routinely determine such questions by straight forward statutory construction of the plain words of the relevant Title 41 statutes. *See, e.g., Jesinoski v. Countrywide Home Loans, Inc*., 574 U.S. 279 (2015) (Court resolved questions about how Truth in Lending Act right to rescind may be invoked and when it is effective by application of plain language of 15 U.S.C. § 1635); *Safeco Ins. Co. of America v. Burr*, 551 U.S. 47 (2007) (Court identified elements needed to prove cause of action for willful violation of the Fair Credit Reporting Act by simple statutory analysis of 15 U.S.C. § 1681n(a)); *Henson v. Santander Consumer USA Inc*., __ U.S. ___, 137 S.Ct. 1718 (2017) (Court concluded individuals and entities who regularly purchase debts originated by someone else and then seek to collect those debts for their own account are not "debt collectors" by straightforward analysis of controlling statutory definition);  *Household Credit Services, Inc. v. Pfennig*, 541 U.S. 232 (2004) (Court's reading of 15 U.S.C. § 1605(a) determined scope of FRB discretion in excluding overlimit fees from finance charge disclosures); *Sayyed v. Wolpoff & Abramson,* 485 F.3d 226 (4th Cir 2007) (Court of Appeals looked strictly to definition in 15 U.S.C. § 1692a(6) to reject debt collecting attorneys' claim of common law immunity from FDCPA, holding "where, as here, the statute's language is plain, the sole function of the courts is to enforce it according to its terms" ); *Tyson v. Sterling Rental, Inc.*, 836 F.3d 571 (6th Cir. 2016) (analysis of question as to

whether car dealer was "creditor" under ECOA "must begin with the statutory text" of  the definition in 15 U.S.C. § 1691a(e)).

Nutter contends plaintiff's March 23, 2018 application was not an application for "credit" under the Equal Credit Opportunity Act because it related only to the collection remedies Nutter could pursue under that loan. Further, Nutter contends  there could not have been any "adverse action" on plaintiff's application because of the default in Archie Johnson's HECM mortgage loan. For these reasons, Nutter contends that plaintiff's claims for relief under complaint Count Four must be dismissed.

An obvious flaw in Nutter's arguments is that they is premised on and ask this Court to engage in and countenance marital discrimination of the type which led Congress originally to enact the ECOA.  The ECOA was meant to protect women, among others, from arbitrary denial or termination of credit due to gender or marital status. *See Anderson v. United Finance Co*., 666 F.2d 1274, 1277 (9th Cir. 1982). It established "as clear national policy that no credit applicant shall be denied ... on the basis of characteristics that have nothing to do with his or her creditworthiness." Equal Credit Opportunity Act Amendments of 1976, S. Rep. No. 94-589, 94th Cong., 2d Sess. 3, reprinted in 1976 U.S. Code Cong. & Ad. News 403, 405.

No creditor may discriminate against an applicant based on marital status, or any other prohibited basis, in the application stage or *any* aspect of a credit transaction. *See* 15 U.S.C. § 1692; 12 C.F.R. §1002.4(a). The ECOA and its implementing Regulation B prohibit creditors from refusing to allow married (or formerly married) persons to make individual applications on just their own behalf. It bars creditors from denying a wife or widow the right to have an individual application judged on her own merits and circumstances, not upon or in relationship to the debts, circumstances, or dealings of her spouse or deceased spouse. *See* 15 U.S.C. § 1692 and 12 C.F.R. § 1002.7(a).

19

This means creditors like Nutter may not deny or condition a wife or widow's individual application for credit based on circumstances or events relating to the debts or accounts of a spouse or deceased spouse unless the applicant herself is an obligor upon, and therefore also contractually liable for, the spouse's debts. *See, e.g., Ballard v. Bank of Am.,* 734 F.3d 308, 311-313 (4th Cir. 2013) (ECOA prohibited Bank of America from requiring wife to assume liability on separate debt for husband's business; however, wife later waived liability on the claim); *Miller v. Am. Express Co.*, 688 F.2d 1235 (9th Cir. 1982) (wife a victim of marital discrimination by American Express when it terminated her individual credit because her husband had died); *McGee v. E. Ohio Gas Co*., 111 F. Supp. 2d 979 (S.D. Ohio 2000) (ECOA prohibits rejecting individual application by woman because of a default or debt owed by spouse), *class cert. granted*, 200 F.R.D. 382 (S.D. Ohio 2001); *defendant's motion for summary judgment den*., 2002 WL 484480 (2002); *In re Brazil*, 21 B.R. 333 (Bankr. N.D. Ohio 1982) (bankruptcy petitioner was the victim of marital status discrimination when her application for individual credit was denied because her husband owed the creditor an outstanding bill).

While Nutter 's memorandum cites some of the statutes or regulations which control the issues raised by its motion to dismiss Count Four of the complaint, Nutter premises its theories on an invidious presumption that the facts or circumstances of the deceased Archie Johnson or his individual debt are attributable to and controlling over plaintiff as his widow. For instance Nutter does not assert that plaintiff was herself a signatory to, or otherwise contractually obligated on, Archie Johnson's fraudulent HECM mortgage. Yet Nutter contends it had no duty to provide "notice of adverse action" under 15 U.S.C. § 1691(d)(2) as to plaintiff's individual March 23, 2018 application *solely because her deceased husband's individual HECM loan was in default*. Similarly, the case authority cited by Nutter all involve circumstances in which the applicant claiming violation of a notice right was already contractually liable on an existing,

underlying debt. That is **not** the situation here. Those cases are facially distinguishable then unless and except for Nutter's invidious insistence on considering plaintiff's individual application as some part of Archie Johnson's dealings just because she is his widow..

Nutter brazenly argues it was justified in violating plaintiff's Equal Credit Opportunity Act rights to proper and timely notice because of her deceased husband's debt and the actions Nutter intended to take to enforce it.  To the extent that the making of that argument represents the reasons for Nutter's actions at the times in question suggests an area for serious attention in discovery as to whether Nutter's violations of the ECOA extend beyond its failure to give notice, into actual invidious discrimination.

But that is an inquiry for another day. At this early stage, it is sufficient that application of the plain language of the controlling statutes to facts not tainted by marital discrimination shows plaintiff's March 23, 2018 individual application constituted one for "credit" as defined by the ECOA, and that Nutter violated 15 U.S.C. § 1691(d) (1) and §1691(d)(2) in connection with that application.

### 1. Plaintiff's March 23, 2018 application was an application for credit as defined by the Equal Credit Opportunity Act and its implementing Regulation B.

Nutter denies that the application plaintiff submitted to Nutter on March 23, 2018, requested an extension of credit as defined by Regulation B.

Regulation B defines an "applicant" entitled to the protection of the ECOA's notice requirements as "any person who requests or who has received an extension of credit from a creditor." 12 C. F. R. § 1002.2 (e). Similarly, "extend credit and extension of credit" are defined to include credit:

> . . . . in any form (including, but not limited to, credit granted in addition to any existing credit or credit limit; credit granted pursuant to an open-end credit plan; the refinancing or other renewal of credit, including the issuance of a new credit card in place of an expiring credit card or in substitution for an existing credit card; the consolidation of two or more

obligations; or the continuance of existing credit without any special effort to collect at or after maturity)

12 C.F.R. § 1002.2 (q). Finally, as defined authoritatively by Reg. B, 12 C.F.R. § 1002.2 (j), "credit" under the ECOA  means a "right granted by a creditor to an applicant to defer payment of a debt, incur debt and defer its payment, or purchase property or services and defer payment therefor." Facially, the alternative criteria with in the definitions of "applicant," "credit," and "extension of credit" are set forth in the disjunctive and should be applied accordingly; one need not satisfy each alternative of each definition to qualify for protection under the statute. *Carter v. Buckeye Rural Elec. Coop.,* 2001 WL 1681104,*4 (S.D. Ohio 2001).

Further, it is well understood that the ECOA definition of "credit" covers a wider range of dealings than does Regulation Z (Truth in Lending); imposition of a finance charge is not necessary for the existence of "credit" under the ECOA. *See* 12 C.F.R., Supplement I Part 1002 (Official Staff Interpretations of Regulation B by the Consumer Financial Protection Bureau), § 1002.2, ¶ 2(c)(2)(v):

> For purposes of Regulation B a transaction is credit if there is a right to defer payment of a debt—regardless of whether the credit is for personal or commercial purposes, the number of installments required for repayment, or whether the transaction is subject to a finance charge.

Moreover, the provisions and requirements of the ECOA and Reg. B must be interpreted liberally to achieve the Act's remedial goals and purposes. *Thompson v. Galles Chevrolet Co.,* 807 F.2d 163, 168 (10th Cir. 1986); *Brothers v. First Leasing,* 724 F.2d 789, 793-794 (9th Cir. 1984), cert. denied, 469 U.S. 832 (1984) *Chen v. Chase Bank USA, N.A.,* 393 F.Supp.3d 850, 853 (N.D. Calif. 2019).

The March 23, 2018 application was an application by plaintiff individually, not from one who was already contractually liable on the HECM mortgage owed Nutter by her deceased husband. Consequently, whether plaintiff was an "applicant" seeking an "extension of credit"

must be analyzed from the facts relevant to her circumstances and perspective, not those of

Archie Johnson. In considering whether an application seeks credit under the ECOA, the

determinative consideration is not how a creditor might characterize that which an application

seeks, but how the nature of what is sought fits the statutory language. *See Mick v. Level*

*Propane Gases, Inc*., 183 F. Supp. 2d 1014, 1019 (S.D. Ohio 2000).

Note that the controlling definitions of "applicant", "credit," or "extension of credit" do

**not** require that a request for credit in the form of "the continuance of existing credit without any

special effort to collect at or after maturity" relate only to credit on which **the applicant** is

already contractually liable. Plaintiff's 2018 MOE application was an application to continue

existing credit covering her home so as to defer payment of the debt that mortgage loan

represented until after a postponed maturity – her own death. Such a request comfortably fits

within the definitional language of § 1002.2(q) and § 1002.2 (j) as an application to extend

credit. In fact, Reg. B expressly contemplates requests of this type as being applications for

credit subject to the ECOA. *See, for instance*, Official Staff Commentary to Reg. B. Section

11002, ¶2- 2(e) (one who asks to assume responsibilities under another's mortgage is an

"applicant", unless assumption is not possible).

Under the HUD MOE process and the application procedures it requires, plaintiff's

March 23, 2018 application sought to continue existing credit by assuming Archie Johnson's

responsibilities under his HECM loan as a non-borrowing spouse. If granted, the application

would have entitled plaintiff to deferral of payment of the outstanding HECM mortgage and

extension of its maturity and enforcement until the time of her own death. Consequently,

Nutter's contention that plaintiff did not apply for "credit" as covered by the ECOA is without merit.[7]

**2. The notice of action required by 15 U.S.C. § 1691(d)(1) is not conditioned on whether "adverse action" has occurred. Moreover, plaintiff was not in default on any loan at the time of her application, so that no exemption from the 15 U.S.C. §1691(d)(2) requirement of timely and proper notice of adverse action applied.**

Nutter argues that even if plaintiff's application was covered by the ECOA and Regulation B, Count Four of the complaint does not allege a valid cause of action because Nutter had no obligation to provide a notice of adverse action, given that her deceased spouse's HECM was then in default.

As previously pointed out, without engaging in prohibited marital discrimination, Nutter cannot justify its evaluation or treatment of plaintiff's individual application for credit based on the circumstances of her deceased husband's account. Plaintiff was not contractually liable on that HECM, and was therefore no more in default or delinquent than any person who seeks to assume someone else's unpaid loan in order to prevent foreclosure. Therefore, Nutter's sole contention as to why it could not possibly violate § 1691(d)(2) is without merit.

But in any regard, Nutter's motion ignores the separate notice requirement enacted by § 1691(d)(1). This statute requires a creditor to give timely and proper notice of its action upon an application. The )d)(1) obligation is separate and distinct from the "adverse action" notice

_____

[7] Nutter may contest this analysis on the basis that HECM mortgages are not generally assumable in the way traditional mortgages may be. However, that is no longer universally true for pre-2008 reverse mortgages. HUD's MOE process expressly provides for agreements under which a non-borrowing spouse can continue existing HECM credit, extend and postpone the maturity which would require the immediate payment of debt, and prevent efforts to collect, so long as she undertakes to fulfill the same responsibilities as the original borrower. From the perspective of the non-borrowing spouse, the substance of an approved MOE application is functionally no different than for a traditional assumption of a home mortgage on the same terms as originally extended.

requirement, and is not subject to the same exemption. *Hackett v. Wells Fargo Bank, N.A.*, 2019 WL 5784741, *7-*8 (C.D. California. 2019); *McMahon v. JPMorgan Chase Bank, N.A.*, 2017 WL 2363690, *3 (E.D. Cal. 2017); *Dionne v. Federal National Mortgage Association*, 2016 WL 3264344 *6-*7 (D. N. H. 2016); *MacDonald v. Wells Fargo Bank N.A,*, 2015 WL 1886000, *3 (N.D. Cal. 2015); *Banks v. JPMorgan Chase Bank, N.A.*, 2014 WL 6476139, *13 (C.D. Cal. 2014); *Vasquez v. Bank of Am., N.A.*, 2014 WL 1614764, *2-3 (N.D. Cal. 2014). Plaintiff's complaint would therefore state a claim under §1691(d)(1) even if it did not also do so under §1691(d)(2).

## V.   CONCLUSION

For the reasons set forth above and in plaintiff's previous briefings on the defendants' motions to dismiss, plaintiff asks that Nutter's motion be overruled in its entirety.

**TAMMY JOHNSON,**
**Plaintiff, by counsel**

<u>/s/ Gary M. Smith</u>
Gary M. Smith (WV Bar No. 12602)
MOUNTAIN STATE JUSTICE, INC.
325 Willey St.
Morgantown, WV 26505
Telephone:  (304) 326-0188
Facsimile:   (304) 326-0189
Email: gary@msjlaw.org
Counsel for Plaintiff